IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TYLER LYMAN, an individual,

                    Plaintiff,

          v.

DRIVING FORCE LOGISTICS, LLC, an
Indiana limited liability company, and
NOVAE, LLC, an Indiana limited liability
company,

                    Defendants.

Case No. 3:24-cv-00826-SB

**OPINION AND ORDER**

---

**BECKERMAN, U.S. Magistrate Judge.**

Plaintiff Tyler Lyman ("Lyman") filed a complaint in Columbia County Circuit Court against Defendants Driving Force Logistics LLC ("DFL") and Novae, LLC ("Novae") (together, "Defendants"), alleging claims for negligence and violation of Oregon's Employer Liability Law ("ELL"), OR. REV. STAT. § 654.305. (Compl., ECF No. 1-1.) Defendants timely removed the case. (ECF Nos. 1, 5.)

Now before the Court is Defendants' motion for summary judgment. (ECF No. 28.) The Court has jurisdiction over Lyman's claims pursuant to 28 U.S.C. § 1332. For the reasons discussed below, the Court denies Defendants' motion for summary judgment.

PAGE 1 – OPINION AND ORDER

## BACKGROUND[1]

On April 21, 2022, Lyman sustained injuries while unsecuring a load of trailers manufactured by Novae and delivered by DFL to Lyman's employer, Trailer Wholesale NW. (*See generally* Compl.) DFL is wholly owned by Novae and the two companies "share the same campus." (Chad Williams Dep. 7:15-18, ECF Nos. 29-1, 34-5.) Novae is a "utility trailer manufacturer" and uses "DFL to deliver [Novae's] trailers to [its] dealerships." (*Id*. at 7:25, 8:4-5.)

The accident occurred on Lyman's "third day on the job" at Trailer Wholesale NW and he was still in training. (Tyler Lyman Dep. ("Lyman Dep.") 17:4, 41:14, ECF Nos. 29-2, 34-1.) Lyman's training included "following [] around" a coworker named Justin Garoutte ("Garoutte"). (*Id*. at 5:18-19.) Fifteen minutes before the accident, the owner of Trailer Wholesale NW, Mike Clark ("Clark"), asked Garoutte to show Lyman how "to unload trailers" and "have him observe." (Justin Garoutte Dep. ("Garoutte Dep.") 18:6, ECF Nos. 29-5, 34-2.)

Fredrick Gish ("Gish"), a DFL employee, delivered the trailers at issue to Trailer Wholesale NW. (Frederick Gish Dep. ("Gish Dep.") 7:20-21, ECF Nos. 29-3, 34-3.) Gish picked up the trailers at DFL'S facility in Indiana, where there is a "a huge building . . . to load the trucks." (*Id*. at 14:13-14.) The facility has "three overhead bays" and "overhead cranes [to] . . . stack the trailers." (*Id*. at 14:14-16.) Gish's load "consisted of two trailers stacked on each other with cribbing[.]" (*Id*. at 14:16-17.) The bottom trailers were "connected to the hitch point" and

---

[1] "Consistent with the standard for summary judgment, the facts recited here are viewed in the light most favorable to [Lyman], the non-moving party, and all reasonable inferences supported by the record are drawn in [Lyman]'s favor." *Haw. Disability Rts. Ctr. v. Kishimoto*, 122 F.4th 353, 358 n.1 (9th Cir. 2024) (citing *McSherry v. City of Long Beach*, 584 F.3d 1129, 1134-35 (9th Cir. 2009)).

there were "ratchet straps on the sides." (Lyman Dep. 15:13-16.) There were "wood blocks in

some places" (*id*.) and the "hitch point coupler was connected to the ball." (*Id*. at 15:15-20.)

During the loading process, Gish ensured his semi-truck was "positioned where it

need[ed] to be." (Gish Dep. at 18:4-5.) Then, Novae's crane operator would set the trailers down,

put on the blocks, and bed the axles. (*Id*. at 18:11-12.) Gish would occasionally help him. (*Id*. at

18:13.) Gish and Novae's crane operator worked together "to secure[] the last group of trailers to

the ball tower." (*Id*. at 18:16-17, 21.) It was the Novae crane operator's responsibility to load the

truck and Gish "was just there to keep an eye [out] and help[.]" (*Id*. at 18:23-24.) Gish would

"try to jump on strapping as soon as they'd get the first stack on." (*Id*. at 18:25-19:1.) It was

Gish's "total[] . . . responsibility" to secure Novae's trailers to the truck. (*Id*. at 18:15, 19:5.)

When Gish delivered a load to Trailer Wholesale NW, he "tried to be there right at

[eight] o'clock when they opened[.]" (*Id*. at 21:4-5.) Gish would "jump out, grab [his] winch

bar," and "try to get everything unsecured and the straps out of the way." (*Id*. at 21:5-8.) "[I]t

was [Gish's] responsibility to make sure that the load was unsecured so it could be offloaded by

Trailer Wholesale NW[.]" (*Id*. at 22:2-5.) To unsecure the trailers, Gish would "go down . . .

alongside the load and start with the back" and then "get up and unloosen these two-inch straps

that were looped." (*Id*. at 21:17-19.) At that point, Garoutte would be "ready to jump on th[e]

forklift and start unloading[.]" (*Id*. at 21:9-10.) Garoutte would "put [the forklift] underneath the

trailer" that he was "going to unhook or unattach." (Garoutte Dep. 12:15-17.) Then, Garoutte

would take the load off and put it on the ground. (*Id*. at 12:16-17.)

On the day of the accident, Lyman was "watching th[is] process while the[] [trailers]

were being unloaded." (Lyman Dep. 42:21-22.) When "the truck and trailer c[ame] in loaded

with trailers," "[Garoutte] start[ed] unloading" and Lyman "was asked to help." (*Id*. at 43:1-2, 6.)

Lyman "can[not] remember" "who told [him] to help." (*Id*. at 53:3-4.) Garoutte "got the forklift underneath [the trailer] and positioned it." (Gish Dep. 31:10-11.) At that point, "the coupler [became] stuck." (*Id*. at 25:1.) When this issue arises, "[Gish] uncaps them." (*Id*. at 25:13-14; *see also id.* at 34:17-22, Gish testified that when the "hitch and ball" became stuck in the past, he "would have been the one . . . trying to uncouple.") To release the coupler, Gish would sometimes "get up on the deck" and do it "by hand like [Lyman] did." (*Id*. at 25:18-19.)

On the day of the accident, Gish first attempted to "knock off" the stuck coupler by using a stick. (Garoutte Dep. 24:25-25:20.) Garoutte recalls Gish "kind of struggling with his pole." (*Id*. at 21:6-7.) Lyman then "jump[ed] up on the truck." (*Id.* at 21:10.) Lyman "went right to the ball tower and the coupler." (Gish Dep. 31:19-20.) "[Garoutte] was trying to tell him to pull up on the latch[.]" (*Id*. at 31:21.) Lyman started "pushing and pulling and he couldn't get [the coupler] to release[.]" (*Id*. at 29:1-2.) Someone told Lyman to "watch out for pinch points." (Lyman Dep. 53:10.) Gish heard Lyman say, "I don't know what to do. This is my first day on the job." (Gish Dep. 29:7-8.) Garoutte "yell[ed] at [Lyman] how to release the coupler." (*Id.* at 32:3.) Gish then "tr[ied] to help [Garoutte] explain to [Lyman] over the noise of the forklift to move the latch back so [Garoutte] could lift th[e] trailer off." (*Id*. at 28:21-23.) Lyman said "[w]ell, I can't" and "[i]t won't release." (*Id*. at 32:7-8.)

Lyman then released the coupler. (Gish After Incident Report, ECF No. 34-7.) "[T]he tongue jumped up impacting [Lyman's] hand between the coupler and the trailer just in front of the trailer that was stuck." (*Id*.; *see also* Gish Dep. 28:9-10, stating that Lyman's "hand was caught between the coupler and the trailer just in front of the trailer that was stuck"; *id.* at 36:17-18, "when the hitch came loose from the ball . . . [Lyman]'s hand got smashed.") Lyman "started moaning or yelling" and Gish saw "blood going everywhere." (Gish Dep. 35:23-24.) Gish

grabbed Lyman's hand and applied pressure to stop the bleeding. (*Id.* at 35:24-25.) Right after

Gish grabbed Lyman's hand, Gish said, "I'm sorry. I'm so sorry.'" (Lyman Dep. 55:21-23.)

Lyman alleges that he suffered a "[c]rushed hand," including "[d]amage to the muscles,

ligaments, tendons, nerves, and other soft tissue of his hand." (Compl. at 4.) These injuries

necessitated "[s]urgery on [Lyman's] hand for phalangeal shaft fracture, metacarpal fracture,

neuroplasty digital, repair extensor tendon, tendon sheath incision, nerve block, and

anchor/screw for opposing bone[.]" (*Id.*) Lyman also suffered "[s]oreness and bruising[,]

[i]mpairment of future income[,] [p]ain, discomfort, suffering, stress, and worry[,] and

[i]nconvenience and interference with usual and everyday activities, apart from gainful

employment." (*Id.*)

## LEGAL STANDARDS

Summary judgment is proper if "there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). At the summary

judgment stage, the court views the facts in the light most favorable to the non-moving party, and

draws all reasonable inferences in favor of that party. *See Porter v. Cal. Dep't of Corr.*, 419 F.3d

885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence,

or determine the truth of matters in dispute. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for

the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith

Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391

U.S. 253, 289 (1968)).

"A grant of summary judgment is appropriate when 'there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law.'" *Albino v. Baca*, 747

F.3d 1162, 1168 (9th Cir. 2014) (en banc) (quoting FED. R. CIV. P. 56(a)). "[T]he mere existence

of *some* alleged factual dispute . . . will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson*, 477 U.S. at 247-48)).

"A material fact is one that is needed to prove (or defend against) a claim, as determined by the applicable substantive law." *Simmons v. G. Arnett*, 47 F.4th 927, 932 (9th Cir. 2022) (citing *Nat'l Am. Ins. Co. v. Certain Underwriters at Lloyd's London*, 93 F.3d 529, 533 (9th Cir. 1996)); *see also Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) ("A fact is 'material' only if it might affect the outcome of the case[.]" (quoting *Anderson*, 477 U.S. at 248)). "An issue of material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party." *Brown v. Arizona*, 82 F.4th 863, 874 (9th Cir. 2023) (en banc) (quoting *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1104 (9th Cir. 2020)); *see also Fresno*, 771 F.3d at 1125 ("[A] dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." (quoting *Anderson*, 477 U.S. at 248)).

In determining whether a genuine issue of material fact exists, a court views the evidence in the light most favorable to, and draws all justifiable inferences in favor of, the nonmoving party. *See McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700, 706 (9th Cir. 2019) (per curiam) ("The court views 'evidence in the light most favorable to the nonmoving party,' to determine 'whether genuine issues of material fact exist.'" (quoting *George v. Edholm*, 752 F.3d 1206, 1214 (9th Cir. 2014))); *Brown*, 82 F.4th at 874 ("When determining whether a genuine issue of material fact exists, [a court] 'must draw all justifiable inferences in favor of the nonmoving party.'" (quoting *Howard v. HMK Holdings, LLC*, 988 F.3d 1185, 1189 (9th Cir. 2021))). In doing so, a "court . . . may not judge credibility, weigh the evidence, or resolve factual

disputes[.]" *Clarkson v. Alaska Airlines, Inc.*, 59 F.4th 424, 437 (9th Cir. 2023) (citing *Anderson*, 477 U.S. at 255).

## DISCUSSION

Defendants move for summary judgment on Lyman's claims for common law negligence and violation of Oregon's ELL.

## I.    NEGLIGENCE CLAIMS

Lyman alleges that Defendants were negligent in one or more of the following ways, each of which created a foreseeable and unreasonable risk of injury to Lyman:

- In instructing, directing, or allowing Lyman to unsecure Defendants' delivery of stacked Sure-Trac trailers from Defendants' semi-truck trailer;

- In failing to properly unsecure the stacked load of Sure-Trac trailers for unloading;

- In failing to warn Lyman the load of trailers was under tension and may spring when the hitch is unlocked from the ball;

- In failing to place safety devices or a block of wood between the trailer tongues/hitches to prevent secured trailers from crushing limbs when springing upward when the hitch is released from the ball;

- In failing to place warning labels on Defendants' equipment that loaded trailers may spring when the hitch is unlocked from the ball causing injury; and

- In failing to otherwise protect Lyman from the dangerous condition created by the stacked load of Sure-Trac trailers.

(Compl. at 3.) Defendants move for summary judgment on the grounds that "there is no evidence that Novae's conduct was negligent or had anything to do with the subject incident" and "there is no evidence that DFL's conduct was negligent." (Defs.' Mot. Summ. J. ("Defs.' Mot.") at 8, 15, ECF No. 28.)

### A.    Applicable Law

"Ordinarily, a claim for liability based on negligence merely requires the plaintiff to plead and prove facts to permit a finding that the defendant's 'conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff.'" *Stone v. Witt*, --- P.3d ---, 374 Or. 524, 530 (2025) (first citing *Fazzolari v. Portland Sch. Dist. No. 1J,* 734 P.2d 1326, 1336 (Or. 1987); and then citing *Sloan v. Providence Health Sys.-Or.*, 437 P.3d 1097, 1102 (Or. 2019)); *see also Sloan*, 437 P.3d at 1102 ("[W]hen asserting an ordinary negligence claim, a plaintiff must establish that the defendant's conduct created a foreseeable and unreasonable risk of legally cognizable harm to the plaintiff and that the conduct in fact caused that kind of harm to the plaintiff.").

"Although reasonableness is generally a question of fact to be determined by a jury, where there is no doubt that a defendant's conduct was reasonable, the court may resolve the question without submitting it to a trier of fact." *Clement v. Ecolab, Inc.*, 341 F. Supp. 3d 1205, 1215 (D. Or. 2018) (citing *Thurman v. Thomas*, 688 P.2d 125, 127 (Or. Ct. App. 1984)); *see also Fazzolari*, 734 P.2d at 1333 ("As far as 'negligence' rests on a standard of reasonable conduct, the issue ordinarily can be left to the jury, although at the outer margins of debatable conduct a court is obliged to say 'that the conduct does or does not meet the standard.'" (quoting *Stewart v. Jefferson Plywood Co.*, 469 P.2d 783, 785 (1970))).

In evaluating foreseeability, "Oregon courts consider 'whether plaintiffs' injuries were within the type of potential harms that made defendant's conduct unreasonable and whether plaintiffs were within a reasonably foreseeable class of injured persons.'" *Brown v. Caterpillar Inc.*, No. 2:21-cv-01865-HL, 2022 WL 3219605, at *6 (D. Or. June 29, 2022) (quoting *Chapman v. Mayfield*, 361 P.3d 566, 572 (Or. 2015)). "The concept of foreseeability in negligence cases involves (1) a factual assessment of whether the thing that happened could have been predicted

or anticipated, and, if so, (2) a value judgment about whether that thing could and should have been prevented by altering the conduct on which the factual prediction of harm was made." *F.T. v. W. Linn-Wilsonville Sch. Dist.*, 509 P.3d 655, 662 (Or. Ct. App. 2022) (citing *Piazza v. Kellim*, 377 P.3d 492, 521 n.6 (Or. 2016)). This analysis is "conduct[ed] through the lens of the particular factual circumstances of the case[.]" *Jennewein v. MCIMetro Access Transmission Serv.*, 481 P.3d 939, 944 (Or. Ct. App. 2021). "[T]he question is whether a reasonable person considering the potential harms that might result from his or her conduct would 'have reasonably expected the injury to occur.'" *Chapman*, 361 P.3d at 572 (quoting *Stewart*, 469 P.2d at 786).

"Distinguishing between employees and agents who are not employees is important for vicarious liability purposes, because a principal's liability for the torts of its agents varies based upon the type of agent." *Vaughn v. First Transit, Inc.*, 206 P.3d 181, 187 (Or. 2009). "In general, a principal is liable for all torts committed by its employees while acting within the scope of their employment." *Id.* (citing *Minnis v. Or. Mutual Ins. Co.*, 48 P.3d 137 (2002)). "But a principal ordinarily is not liable in tort for physical injuries caused by the actions of its agents who are not employees." *Id.* (citing *Jensen v. Medley*, 82 P.3d 149 (Or. 2003)). "[F]or a principal to be vicariously liable for the negligence of its nonemployee agents, there ordinarily must be a connection between the principal's 'right to control' the agent's actions and the specific conduct giving rise to the tort claim." *Id.*

Under the common law "right to control" test, to "be an 'agent' . . . two requirements must be met: (1) the individual must be subject to another's control; and (2) the individual must 'act on behalf of' the other person." *Id.* at 187 (simplified). "An agent is an employee if the principal has the right to control the physical details of the work being performed by the agent; in other words, the principal directs not only the end result, but also controls how the employee

performs the work." *Id*. (citing *Schaff v. Ray's Land & Sea Food Co., Inc.,* 45 P.3d 936, 939 (Or. 2002)). "In contrast, when the agent retains control over the details of the manner in which it performs its duties, that agent is a nonemployee agent." *Id*. (citation omitted).

With respect to a failure to warn theory of negligence, the Oregon Supreme Court has instructed that a defendant may be liable "if the defendant can reasonably foresee that there is an unreasonable risk of harm, a reasonable person in the defendant's position would warn of the risk, the defendant has a reasonable chance to warn of the risk, the defendant does not warn of the risk, and the plaintiff is injured as a result of the failure to warn." *Fuhrer* v. *Gearhart-By-The-Sea, Inc.*, 760 P.2d 874, 878 (Or. 1988) (en banc). The Oregon Supreme Court has outlined "four factors to be considered in determining whether action or a failure to act is reasonable: the likelihood of harm, the severity of the possible harm, the 'cost' of action that would prevent harm, and the defendant's position, including the defendant's relationship with the plaintiff." *Id.* at 878.

### B.    Analysis

#### 1.    Novae

Defendants move for summary judgment on the ground that Lyman has not provided any evidence that Novae's conduct was negligent. (Defs.' Mot. at 8-11; *see also* Defs.' Reply Supp. Mot. Summ. J. ("Defs.' Reply") at 11-13, ECF No. 35.)

Specifically, Defendants deny that an agency relationship existed between Novae and Gish because DFL employed Gish and Novae is not responsible for Gish's actions. (Defs.' Reply at 4-5.) Defendants also assert that "[t]he only argument that Plaintiff makes regarding specific conduct of Novae was that Novae failed to place wood blocks between the trailers" but "[Lyman] has provided no evidence that it would have been foreseeable to Novae that not using wood blocks would result in a hand injury." (*Id.* at 12-13.) Defendants also claim that there were

"blocks in place to prevent the Sure-Trac trailers from moving in transit." (Defs.' Mot. at 11.)
Finally, Defendants argue that "there is no evidence that Novae knew or should have known that
the subject trailer was under tension and may spring when the hitch is unlocked from the ball."
(Defs.' Reply at 16; *see also* Defs.' Mot. at 10-11.)

Lyman responds that "Novae owns the semi-truck and custom trailer rigs used to deliver
its Sure-Trac utility trailers." (Pl.'s Resp. Defs.' Mot. Summ. J. ("Pl.'s Resp.") at 10-11, ECF
No. 32, citing Dep. Nathan Higdon ("Higdon Dep.") 5:23-6:7, ECF No. 34-4.) Lyman notes that
"Novae loads the rigs and their own truck driver secures each load including the hitch and ball
mounted to the custom built semi-truck trailer which is used to secure the load." (*Id.* at 7-8.)
Lyman alleges that Gish was "an agent for Novae because he was operating their rig and
handling their product" and as Novae's agent, "Gish did not unsecure his load from the semi-
truck trailer to allow for unloading of the utility trailers." (*Id*. at 11.) Lyman also claims that
Novae "did not warn [him] that a stuck hitch on a ball might be under tension and spring up
when released" and "chose not to place warnings on their trailers or anywhere else of the danger
of a hitch being released under tension and springing up which may cause injury." (*Id*.)

Viewing these facts in the light most favorable to Lyman and drawing all reasonable
inferences in his favor, the Court finds that a reasonable jury could conclude that Novae's
conduct "unreasonably created a foreseeable risk to a protected interest of the kind of harm that
befell" Lyman. *Fazzolari,* 734 P.2d at 1336.

First, with respect to Lyman's vicarious liability theory, there are genuine disputes of
material fact regarding the degree of control that Novae exercised over Gish. Although it is
undisputed that DFL—not Novae—employed Gish (*see, e.g.*, Gish Dep. 7:20), Gish was
responsible for securing and unsecuring Novae's trailers at the time of the accident and a

reasonable jury could conclude based on the evidence in the record that Novae retained some

control over how Gish loaded, transported, delivered, unsecured, and unloaded Novae's trailers.

With respect to Lyman's theory that Novae was negligent in failing properly to place

safety devices or a block of wood to prevent injury, there remains material disputed facts about

whether there were such devices placed in the appropriate places prior to the accident. (*Compare*

Defs.' Mot. at 11, "[t]here were blocks in place to prevent the Sure-Trac trailers from moving in

transit" *with* Pl.'s Resp. at 23, agreeing "that the utility trailers were placed on wood blocks for

transit" but Lyman's "allegation, however, is that there was no safety block between the utility

trailer hitch connected to [the] semi[-]truck trailer mounted ball tower and underneath the utility

trailer stacked above it" and "[a] block of wood or Styrofoam could have prevented Lyman's

hand from being crushed"; *see also id.*, asserting that "each utility trailer has a safety chain

which, in turn, could have been secured to the semi[-]truck trailer bed which would have

prevented the trailer from springing up and into another trailer.")

Defendants argue that "[Lyman] has provided no evidence that it would have been

foreseeable to Novae that not using wood blocks would result in a hand injury" and "there is no

evidence that there was some requirement for Novae to use wood blocks between the trailers."

(Defs.' Reply at 12-13.) However, the summary judgment record reflects that Novae was aware

of the importance of using safety blocks to secure its trailers. For example, Gish testified that

while loading the trucks, Novae's crane operators "would go around and . . . put[] [on] the

blocks." (Gish Dep. 18:2, 11-12.) Gish also testified that "[w]e always blocked the rear axles"

(*id*. at 12:21-22) and "[t]he trailer where [Lyman] removed the block . . . [was] the trailer that

injured his hand." (*Id*. at 118:12-13.) Gish also acknowledged that safety chains were available

to secure Novae's trailers but were not used. (Gish Dep. 12:19-21, "I don't believe we used

the[m] – we didn't use the chains in helping secure the trailers.") In light of the availability of safety blocks and chains at the loading site, a reasonable juror could conclude that Novae's failure to use them created a foreseeable risk of harm.

The Court further finds that a reasonable jury could conclude that an individual uncoupling the hitch to unload the trailers was "within a reasonably foreseeable class of injured persons." *Brown*, 2022 WL 3219605, at *6. Importantly, Gish acknowledged that in his experience "uncoupling [trailers, he has] had the experience of a trailer springing up off of a ball . . . [a] couple of times." (Gish Dep. 44:24-45:2.) Consequently, a reasonable juror could conclude that this type of accident was foreseeable and that an individual disconnecting the trailers from the truck was within a reasonably foreseeable class of injured persons.

Finally, with respect to Lyman's failure-to-warn theory of liability based on Novae's failure to place warnings on its trailers, Defendants argue that "there is no evidence that Novae knew or should have known that the subject trailer was under tension and may spring when the hitch is unlocked from the ball." (Defs.' Reply at 16.) The Court finds that there is a genuine issue of material fact as to whether this risk was foreseeable. For example, Nathan Higdon, a Novae employee and Sure-Trac plant manager, acknowledged that there were no warning labels on the Sure-Trac trailers. (Higdon Dep. 4:4-5; 12:6-8.) Higdon also testified that the Sure-Trac trailers come with operating manuals that include warnings about the locking and unlocking of the coupler, but Novae delivers the operating manuals electronically to the customer or buyer. (*Id*. at 12:10-13:4.) In light of the fact that Novae is aware of the risks of locking and unlocking the coupler as evidenced by its inclusion of warnings in its operating manuals, a reasonable jury could find that Novae could have reasonably foreseen that there was an unreasonable risk of harm, a reasonable person in Novae's position would warn of the risk, Novae had a reasonable

chance to but did not warn of the risk, and Lyman was injured as a result of the failure to warn. *See Fuhrer*, 760 P.2d at 878; *see also Pickens v. United States*, No. 08-cv-6305-PK, 2010 WL 11580099, at *4 (D. Or. Oct. 12, 2010) ("[A] failure to warn claim under Oregon law should be analyzed in terms of foreseeability and unreasonable conduct, just like other negligence claims." (citing *Fuhrer*, 760 P.2d at 877)).

For all of these reasons, there are genuine issues of material fact with respect to Lyman's theories of negligence liability against Novae, and therefore the Court denies Defendants' motion for summary judgment on Lyman's negligence claim against Novae.

### 2.    Driving Force Logistics

Defendants argues that summary judgment should enter on Lyman's negligence claim against DFL because "[Lyman] has provided no evidence that Mr. Gish knew or should have known that the subject trailer was under tension and may spring when the hitch is unlocked from the ball" and "[Lyman's] allegation that DFL 'failed to place safety devices or a block of wood between the trailer tongues/hitches' is incorrect" because "[t]here were blocks in place to prevent the Sure-Trac trailers from moving in transit, and [Lyman] himself testified that he remembered seeing the wood blocks and being told by Mr. Garoutte to remove them." (Defs.' Mot. at 16-18; Defs.' Reply at 13-16.) Defendants further argue that DFL "was not and never has been [Lyman's] employer." (Defs.' Reply at 13, "[Lyman] was not employed by DFL and was not an employee of DFL.")

Lyman responds that DFL was "negligent in employing Lyman to unsecure the utility trailers from their mount on the Novae custom built semi[-]truck trailer." (Pl.'s Resp. at 19.) Lyman also claims that DFL is "liable for failing to warn because Mr. Gish was giving instructions to Lyman to uncouple the hitch." (*Id.* at 18.) Finally, Lyman states that DFL was

negligent in failing to implement "safety devices and blocks . . . to prevent the injury here." (*Id.* at 23.)

Viewing the facts in the light most favorable to Lyman and drawing all reasonable inferences in his favor, the Court finds that a reasonable jury could conclude that DFL's conduct "unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell" Lyman. *Fazzolari,* 734 P.2d at 1336.

First, with respect to Lyman's vicarious liability theory, there are genuine disputes of material fact regarding the degree of control that DFL, by and through Gish, exercised over Lyman's uncoupling of the hitch. Although it is undisputed that DFL did not employ Lyman (*see* Lyman Dep. 10:6-7, "[Y]ou were an employee of Trailer Wholesale NW; is that correct? Yes."), the parties dispute the extent to which Gish instructed Lyman how to unhook the coupler. Gish appears to deny that he instructed Lyman to assist with disconnecting the trailer (Gish Dep. 32:12-16, "[T]his young man that I'd never met or seen before, he jumped up on the trailer behind me and someone had directed him to go right there to the hitch and help [Garoutte], so I don't know if [Garoutte] and him had talked at all."), but acknowledges that he told Lyman how to do so. (*Id.* at 32:6-7, testifying that he told Lyman "[y]ou've got to move the latch back, pull up, and move it back"). If Gish, a DFL employee, instructed Lyman how to disconnect the trailer from the coupler mounted to the bed of Gish's semi-truck, a reasonable juror could conclude that Gish and, therefore, DFL, exercised the requisite control over Lyman at the time of the accident. *Vaughn*, 206 P.3d at 187.

With respect to Lyman's theory that DFL was negligent in failing properly to place safety devices or a block of wood to prevent injury, the Court incorporates its analysis above

concluding that there remain material disputed facts about whether there were such devices placed in the appropriate places prior to the accident.

Finally, with respect to Lyman's failure-to-warn theory of liability based on Gish's failure to warn Lyman, Defendants argue that "there is no evidence that a warning would have stopped this incident from occurring." (Defs.' Mot. at 17.) Defendants also claim that "[w]ithout evidence that Mr. Gish and/or DFL knew or should have known the trailer at issue was under tension (rather than stuck for some other reason) and would 'spring up' [Lyman] cannot be successful in his failure to warn claims." (Defs.' Reply at 16.) Lyman argues that "[t]he jury is entitled to answer the question if a reasonable person in Mr. Gish's . . . [position] would warn Lyman of the risk, had a reasonable chance to warn of the risk, and was Lyman injured as a result of the failure to warn." (Pl.'s Resp. at 21.)

With respect to the first and second factors of the Oregon Supreme Court's *Fuhrer* test (i.e., likelihood and severity of harm), there remains a factual dispute regarding who warned Lyman about "pinch points," but regardless of whether Gish or Garoutte provided the warning, the warning demonstrates an awareness of the likelihood of harm. In addition, Gish previously "had the experience of a trailer . . . springing up off of a ball" a "couple of times" (Gish Dep. 44:25-45:1), and Lyman notes that "OSHA has documented sixty-eight instances of injury, amputations, and death from truck and trailer and hitch accidents." (Pl.'s Resp. at 22.) The Court concludes that a reasonable juror could find that Lyman satisfies *Fuhrer*'s first and second factors.

With respect to the third and fourth factors, a reasonable jury could also conclude that Gish was in a position to warn Lyman and the cost of a warning was low in light of the fact that

Gish was by Lyman's side at the time of the accident and issued "instruct[ion]" to him throughout the unloading process. (Lyman Dep. 52:19.)

Viewing these facts in the light most favorable to Lyman and resolving all reasonable inferences in his favor, the Court concludes that reasonable minds could disagree on whether DFL was negligent and therefore the question should go to a jury. *See Bordelon v. Airgas USA, LLC*, 603 F. Supp. 3d 946, 960 (D. Or. 2022) (denying the defendant's motion for summary judgment because "[d]rawing all reasonable inferences in Plaintiff's favor, a reasonable juror could find the collision and Plaintiff's resultant injuries sufficiently foreseeable, and therefore find Defendants' conduct negligent"); *Hammick v. Jacobs*, No. 3:19-cv-00200-JR, 2020 WL 6135464, at *7 (D. Or. Oct. 19, 2020) (denying the defendant's motion for summary judgment because "whether defendants' conduct was reasonable under the circumstances presents a question of material fact that precludes summary judgment on plaintiff's [negligence] claim"); *Bird v. Lewis & Clark Coll.*, 104 F. Supp. 2d 1271, 1278 (D. Or. 2000) (denying the defendant's motion for summary judgment because "[t]he court f[ound] extensive questions of disputed fact prohibiting any ruling 'as a matter of law' as to whether the defendants were negligent"), *aff'd*, 303 F.3d 1015 (9th Cir. 2002).

For all of these reasons, the Court denies Defendants' motion for summary judgment on Lyman's negligence claims.[2]

---

[2] In his complaint, Lyman also alleges that Defendants were "negligent per se in that [they] violated the rules and regulations made as prescribed by the Oregon Department of Consumer and Business Service," including Oregon's Safe Employment Act ("OSEA"). (Compl. ¶¶ 2-4.) In his response to Defendants' motion for summary judgment, Lyman clarifies that he "made no claim under the Oregon Safe Employment Act." (Pl.'s Resp. at 18.) Indeed, "[t]he Oregon Court of Appeals has held that 'noncompliance with the OSEA cannot be the basis for a negligence per se claim against an indirect employer.'" *Miller v. Goodyear Tire & Rubber Co.*, 434 F. Supp. 3d 877, 884 (D. Or. 2020) (citing *George v. Myers*, 10 P.3d 265 (Or. Ct. App. 2000)).

## II.    EMPLOYER LIABILITY LAW CLAIMS

Defendants also move for summary judgment on Lyman's ELL claims on the ground that neither Novae nor DFL were Lyman's "employer or indirect employer, as those terms are used and understood under Oregon's ELL." (Defs.' Mot. at 19.) Lyman responds that Defendants are liable under the ELL because they "employed Lyman for his personal services in disengaging the hitch from the ball on Defendants' custom built semi[-]truck securing Defendants' interstate shipped utility trailers." (Pl.'s Resp. at 12.)

### A.    Applicable Law

Oregon's ELL "imposes 'a higher standard of care on employers engaged in lines of work involving risk or danger' than is provided at common law." *Gibson v. Owyhee Produce, LLC*, No. 3:11-cv-01132-SI, 2014 WL 5092125, at *2 (D. Or. Oct. 9, 2014) (quoting *Trout v. Liberty Nw. Ins. Corp.*, 961 P.2d 235, 239 (Or. Ct. App. 1998)). The ELL imposes liability on "all owners, contractors or subcontractors and other persons having charge of, or responsibility for, any work involving a risk or danger to the employees or the public." OR. REV. STAT. § 654.305. "The ELL 'applies not only to direct employers but also to 'indirect employers.'" *Gibson*, 2014 WL 5092125, at *2 (quoting *Brown v. Boise-Cascade Corp.*, 946 P.2d 324, 329 (Or. Ct. App. 1997)).

"ELL liability can be imposed on a person or entity who (1) is engaged with the plaintiff's direct employer in a 'common enterprise'; (2) retains the right to control the manner or method in which the risk-producing activity was performed; or (3) actually controls the manner or method in which the risk producing activity is performed." *Woodbury v. CH2M Hill, Inc.*, 61 P.3d 918, 921 (Or. 2003). Under common enterprise liability, "the [ELL] could be invoked against a third-party employer [defendant] when the third-party employer defendant and the plaintiff's employer participated in a common enterprise[.]" *Whitman v. Polygon Nw. Co.*, 379

P.3d 445, 452 (Or. 2016). "[T]he common enterprise category applies in circumstances where both employees of the defendant and employees of the direct employer of the plaintiff have intermingled duties and responsibilities in performing the risk-creating activity or where equipment that the defendant controls is used in performing that activity." *Id*. This intermingling "must be more than a common interest in an economic benefit which might accrue from the accomplishment of the enterprise." *Sacher v. Bohemia, Inc.*, 731 P.2d 434, 439 (Or. 1987). In addition, "[t]he injury must result by virtue of the commingling of the activities of the two employers and not be solely attributable to the activities or failures of the injured workman's employer." *Brown*, 946 P.2d at 329.

With respect to the "risk or danger" element of an ELL claim, courts consider "both the worker's discrete task and the circumstances under which the worker performs that task." *Quirk v. Skanska USA Building, Inc.*, No. 3:16-cv-0352-AC, 2018 WL 2437537, at *7 (D. Or. May 30, 2018) (citing *Woodbury*, 61 P.3d at 921-22). "There are two scenarios under which an employment can be considered inherently dangerous under the ELL: (1) '[i]f the employment as a class is inherently dangerous'; or (2) if 'an otherwise nondangerous employment is rendered inherently dangerous' by 'the presence of certain conditions[.]'" *Helland v. Hoffman Const. Co. of Or.*, No. 3:11-cv-01157-HU, 2013 WL 5937001, at *5 (D. Or. Nov. 3, 2013) (citing *Bottig v. Polsky*, 201 P. 188, 194-95 (Or. 1921)). Typically, "'the question of whether a particular employment is inherently dangerous is for the jury to decide from the evidence in the case,' and only in 'clear cases,' is a court authorized to decide as a matter of law that work does not involve risk and danger within the meaning of the ELL." *Arellano v. Lamb Weston, Inc.*, No. 2:20-cv-00371-SU, 2021 WL 666960, at *3 (D. Or. Feb. 19, 2021) (quoting *Snyder v. Seneca Lumber Co.*, 298 P.2d 180, 182 (Or. 1956)). "'[C]lear cases' are those that as a matter of law do or do not

present dangers which are uncommon." *Id.* (simplified). Nevertheless, "where reasonable minds

can differ, it is a jury question whether or not any particular work involves 'risk or danger.'"

*Richardson v. Harris*, 395 P.2d 435, 436 (Or. 1964) (citing *Parks v. Edward Hines Lumber Co.*

*et al.*, 372 P.2d 978, 980 (Or. 1962)).

### B.    Analysis

The Court concludes that a reasonable jury could find Novae and DFL liable for Lyman's

injuries pursuant to Oregon's ELL.

### 1.    Risk or Danger

Defendants move for summary judgment on the ground that Lyman was "not involved in

any work that involved risks or dangers, as that concept has been understood under the ELL"

because "unloading a delivery of trailers and uncoupling a trailer [is] a common task that

requires no specific training or expertise." (Defs.' Mot. at 12.) Lyman responds that the "Court

cannot rule as a matter of law . . . that unhitching a trailer from a ball is not a risky activity."

(Pl.'s Resp. at 14.) Lyman emphasizes the heavy-duty nature of the machinery, with "[t]he utility

trailers weigh[ing] 3,000 lbs. up to 7,000 lbs." and notes that "the utility trailers [are] off-loaded

using two ton diesel powered Hyster forklift[s]." (*Id.*) Lyman also cites data from "the U.S.

Department of Labor, Occupational Safety and Health" which "recorded sixty-eight trailer hitch

accidents with twenty-one of those being fatalities" in an unspecified period. (*Id.*)

Viewing the facts in the light most favorable to Lyman and drawing all reasonable

inferences in his favor, the Court finds that a reasonable jury could conclude that uncoupling a

several thousand pound trailer from a semi-truck is work that involves "risk or danger" under the

ELL. *See Quirk*, 2018 WL 2437537, at *8 ("Whether work involves risk or danger under the

ELL is a question of fact that the court may resolve at summary judgment only if no reasonable

jury could conclude that risk or danger was involved." (citing *Golden v. Ash Grove Cement Co.*,

PAGE 20 – OPINION AND ORDER

No. CV 06-336-PK, 2007 WL 1500168, at *4-5 (D. Or. May 21, 2007))); *Golden*, 2007 WL 1500168, at *5 ("The question properly before the court is whether . . . a reasonable jury could conclude that risk or danger was involved where [the plaintiff] was required to slide a heavy gangway along a metal track subject to blockage by falling debris. Following the concededly vagarious precedent established by Oregon's ELL jurisprudence, this court is unwilling to invade the province of the jury to make this determination as a matter of law.").

While there may be circumstances under which a worker's task of uncoupling equipment is not particularly risky or dangerous, reasonable minds could disagree on whether the circumstances under which Lyman performed that task here—uncoupling trailers that weighed several thousand pounds—was risky or dangerous. *See Snyder*, 298 P.2d at 183 ("The scaling of logs in and of itself is not a hazardous occupation, nor does it involve risk and danger within the meaning of the [ELL]. But where the scaling is required to be done concurrently with the logging operations, and in the vicinity and as a part thereof, such scaling may well involve risk and danger within the meaning of the law.") (citation omitted); *cf. Anderson v. Intel Corp.*, No. 3:20-cv-02138-AC, 2021 WL 1401492, at *5 (D. Or. Apr. 14, 2021) (holding that the plaintiff "alleges sufficient facts to support her [ELL] claim that the work involved risk or danger" where she alleged that "the work involved not just the ordinary, everyday risk of retrieving parts from the laydown area, but instead retrieving parts from the laydown area under the risky or dangerous conditions because the area was cluttered, poorly lit, dusty, and slippery"); *Arellano*, 2021 WL 666960 at *3 (holding that "working in close proximity to heavy equipment in the form a forklift, in a small and confined area without adequate visibility" was "sufficient to establish the inherent dangerousness of the work at the pleading stage of the case").

///

PAGE 21 – OPINION AND ORDER

2.     **Common Enterprise**

Defendants also argue that Lyman has not established that Defendants were his indirect employers under the ELL. (Defs.' Mot. at 13.) Lyman responds that Defendants are liable under the ELL because, *inter alia*, they were engaged with Trailer Wholesale NW in a common enterprise. (Pl.'s Resp. at 14.)

Viewing the facts in the light most favorable to Lyman and drawing all reasonable inferences in his favor, a reasonable jury could conclude that Novae and/or DFL were engaged in a common enterprise with Trailer Wholesale NW with respect to the risk-producing activity at issue because of their intermingled duties and responsibilities or control of the equipment used in performing the activity. *See Whitman*, 379 P.3d at 452 ("In short, the common enterprise category applies in circumstances where both employees of the defendant and employees of the direct employer of the plaintiff have intermingled duties and responsibilities in performing the risk-creating activity or where equipment that the defendant controls is used in performing that activity.").

Despite Defendants' argument that Novae and Trailer Wholesale NW were not working together on a project and therefore Novae's operations were not an "integral part" of Trailer Wholesale NW's service (Defs.' Mot. at 12), the jury could conclude that Novae and/or DFL engaged in cooperative conduct with Trailer Wholesale NW to accomplish a task in which all were interested, i.e., loading and unloading Novae's trailers.

In a recent Ninth Circuit case, the plaintiff "was injured while delivering and unloading windows owned by [the defendant]." *Groeneweg v. JELD-WEN, Inc.*, No. 23-35578, 2025 WL 852898, at *1 (9th Cir. Mar. 19, 2025). "It [wa]s undisputed that Defendant loaded the trailer and that the trailer was sealed from the time it left Defendant's facility . . . until it arrived at [the plaintiff's employer's] facility." *Groeneweg v. JELD-WEN, Inc.*, No. 6:20-cv-01030-AA, 2023

WL 5015823, at *6 (D. Or. Aug. 7, 2023), *rev'd*, 2025 WL 852898 (9th Cir. Mar. 19, 2025).

"The unloading process was carried out by Plaintiff . . . and no direct employees of Defendant

were present." *Id.* In addition, "Defendant did not instruct Plaintiff on how to unload the truck,

nor was [the plaintiff]'s injury caused by a failure of Defendant's equipment." *Id.* As a result, the

district court concluded that "Defendant's lack of control over how the risk-producing activity

[was performed] prevents liability under a 'common enterprise' theory." *Id.*

On review, the Ninth Circuit disagreed. The Ninth Circuit reasoned that the acts of

loading and unloading are sufficiently "intermingled duties and activities" to form a common

enterprise because there "cannot be unloading without loading." *Groeneweg*, 2025 WL 852898,

at *3 ("In the joint enterprise of delivering [the defendant's] windows across the country, there

cannot be unloading without loading. Only [the defendant's] employees loaded the trailer."). In

*Groeneweg*, the risk-producing activity involved both loading and unloading the goods even if

the loading defendant was not directly involved in the plaintiff's unloading activity. *Id.*

Here, Defendants acknowledge that "the risk-producing activity at issue in this case was

the unloading of trailers from the truck." (Defs.' Reply at 7.) Applying the Ninth Circuit's

guidance in *Groeneweg*, a reasonable jury could conclude that the risk-producing activities of

unsecuring and unloading the Sure-Trac trailers necessarily means that Defendants' securing and

loading of the trailers were sufficiently intermingled duties and activities to form a common

enterprise. *See id.* ("The district court erred by focusing only on unloading as the "risk-producing

activity.").

In addition to finding that Defendants were engaged in intermingled duties and

responsibilities in performing the risk-creating activity, a reasonable juror could also conclude

that Novae and/or DFL had control over the equipment Lyman used in performing the risk-

creating activity, *i.e.*, disconnecting Novae's trailer from the coupler mounted to the bed of the semi-truck DFL used to deliver the trailer. *See Thomas v. Foglio*, 358 P.2d 1066, 1070 (Or. 1961) ("The narrower question presented to us in the case at bar . . . is whether an employer can be regarded as 'having charge of' work where the component part of the general undertaking for which he is responsible does not involve any risk-creating activity on the part of his employee but does call for the use of equipment over which he has control and which, if not maintained with proper safeguards, necessarily exposes the employees of the other employer to an unreasonable risk in the course of carrying on the common enterprise."); *Whitman*, 379 P.3d at 452 (holding that "the common enterprise category applies in circumstances where . . . equipment that the defendant controls is used in performing th[e risk-creating] activity").

Here, Gish picked up the load of Novae's trailers at Novae's facility and worked together with Novae employees to load and secure his semi-truck with Novae's trailers. (Gish Dep. 7:10-11, 14-16; 9:19, 21; 10:10, 17.) Both Novae's crane operators and Gish were responsible for securing the trailers to the semi-truck. (*Id*. at 9:4-17.) Viewing the facts in the light most favorable to Lyman, both Novae and DFL had control over the equipment used in performing the risk-creating activity, i.e., disconnecting Novae's trailer from the coupler mounted to the bed of the semi-truck operated by DFL. In addition, as summarized above, there are disputed material facts regarding Gish's role in directing Lyman how to unsecure the load of trailers once he reached Trailer Wholesale NW. On this factual record, a reasonable jury could conclude that Novae and/or DFL had control over the equipment Lyman used in performing the risk-creating activity. *See Gibson*, 2014 WL 5092125, at *4 (denying the defendant's motion for summary judgment where "there [wa]s a disputed issue of fact regarding whether [the defendant] controlled the risk-producing activity of [the plaintiff's effort to secure] the load [on a flatbed

truck]"); *Wilson v. P.G.E. Comp.*, 448 P.2d 562, 565 (Or. 1968) ("When, as the result of the activities of [the] defendant's . . . use of his equipment, a risk of danger is created which contributes to an injury to [the] plaintiff who is the employee of another engaged in work on the same project, [the] defendant has been considered to have sufficient control over the work to be subject to the duties imposed by the [ELL]." (citing *Thomas*, 358 P.2d at 1070)); *Thomas*, 358 P.2d at 1070 (applying the ELL and holding that "the defendant had 'charge of' and was 'responsible for' that part of the job or 'work' which consisted of furnishing safe equipment to be used in a loading operation").

For all of these reasons, the Court denies Defendants' motion for summary judgment on Lyman's ELL claims.[3]

**CONCLUSION**

For the reasons stated, the Court DENIES Defendants' motion for summary judgment (ECF No. 28), and will schedule a jury trial at the parties' convenience.

**IT IS SO ORDERED.**

DATED this 11th day of February, 2026.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge

---

[3] The Court will address prior to trial whether Lyman may also present his "actual control" and "retained right of control" theories of ELL liability to the jury. (Pl.'s Resp. at 13-15.) In addition, the Court does not address Defendants' objections to the expert report of Wesley B. Curtis, Jr. (*see* Defs.' Reply at 7-8; *see also* Decl. Wesley B. Curtis, Jr. Supp. Pl.'s Resp., ECF No. 33), because the Court did not rely on the expert opinion to reach its conclusions herein.